Filed 4/27/15  P. v. Carillo CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B247243 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA350171) |
| v. | |
| MARIO EFRAIN CARRILLO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig Elliott Veals, Judge.  Affirmed as modified.

Koryn & Koryn and Daniel G. Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Mario Efrain Carrillo, appeals his conviction for premeditated attempted murder, false imprisonment by violence, and sexual penetration by a foreign object, with firearm and great bodily injury enhancements (Pen. Code, §§ 664, 187, 236, 237, 289, 12022.5, 12022.53, 12022.7.)[1] He was sentenced to state prison for a term of life plus 25 years to life.

The judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

H.A. lived with her parents. She had a boyfriend named Arturo T. She started seeing Arturo in July 2008 after she broke up with defendant Carrillo, her former boyfriend. Carrillo refused to accept the breakup. He persisted in texting H.A., calling her and showing up at her house at all hours of the day and night to see what she was doing. H.A. changed her telephone number, but nothing discouraged him. Although Carrillo continued to harass her, H.A. did not want to involve the authorities. She pretended to be friendly with him, but she refused to date him. Her way of handling the situation was to keep Carrillo away from Arturo and hope he would eventually give up his obsessive pursuit of her.

When Carrillo discovered that Arturo was seeing H.A., Carrillo began harassing Arturo, too.

a. *The sexual assault*.

On September 5, 2008, H.A. went on a date with Arturo. That night, he gave her a live baby duck as a present.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

In the early morning hours of September 6, Arturo dropped H.A. off at her car and she drove home.[2] As she was walking toward the house, she heard Carrillo's distinctive whistle. She ran toward the front door, but he stopped her, held a gun to her back and told her to get back into her car. H.A. was afraid, so she got into the car with Carrillo and, at his direction, drove to his residence. When Carrillo discovered the duck, he said he was going to throw it out the window because Arturo had given it to her. H.A. told him not to do it.

When they reached Carrillo's apartment building, he ordered H.A. out of the car. She pretended to comply, but after Carrillo got out she jumped back into the car and locked the doors. Carrillo's brother came out and Carrillo handed him the gun. Carrillo then banged on the car window and threatened to break it if H.A. did not get out. She got out because she was scared and she did not want him to break the car window. Carrillo started pulling her toward his apartment building. At the same time, he called Arturo on H.A.'s cell phone and began arguing with him. Arturo testified that during this phone conversation, Carrillo said: "I have your bitch . . . I'm going to kill her."

Meanwhile, H.A. went into Carrillo's apartment. She took the duck with her because Carrillo had "said he was going to squish it." Carrillo's mother and sister were home. Carrillo's mother asked about the duck and H.A. let her play with it. Carrillo's brother stood in the doorway to prevent H.A. from leaving the apartment.

After getting off the phone with Arturo, Carrillo entered the apartment and forced H.A. into the bedroom.[3] He put the gun down next to a snake cage. Carrillo and H.A. argued; he said she was stupid for not wanting to be with him. He yanked her out of her chair and she fell to the floor. Carrillo got on top of her, choked her and called her a bitch. He said she "wasn't going to get out alive." H.A. tried to push him away. He took her pants half-way down and then removed his own. He penetrated her vagina with his

---

[2]     H.A. testified she had been parking away from her house in order to confuse Carrillo regarding her whereabouts.

[3]     H.A. testified Carrillo and his family lived in a one bedroom apartment.

3

penis, but not completely because he was unable to get an erection. He inserted his fingers repeatedly into her vagina and once into her anus.

Carrillo allowed H.A. to leave after several hours. She went home and told her father what had happened. At his encouragement, she went to the police and filed a report. A sexual assault examination was performed.

In a recorded interview two days later, Carrillo was interrogated about this incident by two police detectives. He admitted having forced H.A. to drive to his apartment and then sexually assaulting her, but he denied having used a gun. Carrillo claimed he loved H.A. and he just wanted her to continue being his girlfriend. A portion of this interview was played for the jury.

b. *The shooting.*

Despite the fact H.A. had gone to the police, Carrillo continued to harass both her and Arturo. He frequently came by H.A.'s house and knocked on her window in the middle of the night. At some point, Arturo visited Carrillo in order to speak to him "man-to-man" about the situation, but Carrillo continued to make annoying telephone calls to Arturo. Carrillo threatened to shoot Arturo if he did not break it off with H.A.

On the morning of December 8, 2008, Carrillo showed up at H.A.'s house and they argued. Carrillo was upset because she refused to marry him. H.A. and Arturo had arranged to go jogging that morning. At one point, when H.A. did not answer her cell phone, Arturo became concerned and drove to her house. On the way there, he saw Carrillo at a pay phone two blocks from H.A.'s house.

Arturo stopped at the pay phone and approached Carrillo. He told Carrillo to stop harassing him. Carrillo said to leave him alone and then ran off. Arturo continued on to H.A.'s house and he and H.A. talked while standing in her driveway. A silver truck drove by, which H.A. recognized as belonging to Jesus Javier Jasso, whom she knew as "Vision." Jasso was a friend of Carrillo's. H.A. told Arturo, "There goes Vision," and Arturo said, "Just hurry up, and go get ready." Arturo had seen Jasso drive by H.A.'s house on previous occasions.

4

As Arturo stood outside waiting for H.A. to get ready, Jasso's truck pulled up at the street corner. Arturo could see Jasso in the driver's seat and Carrillo in the passenger seat. They looked in Arturo's direction while speaking to each other. Then the truck drove over to where Arturo was standing. Carrillo and Jasso made eye contact with Arturo and smirked at him. Carrillo said, "What's up?" Arturo thought they were going to beat him up, but he stood his ground because he knew they would be able to catch him if he ran. Carrillo got out of the truck; he was wearing a black glove on one hand. He pulled up his shirt and said, "What's up bitch, what's up now bitch." Carrillo then took a handgun from his waistband and pointed it at Arturo, who started running. Carrillo began shooting at him. Arturo jumped a fence, then turned and saw that Carrillo was chasing him. Jasso remained in the truck, following along as Carrillo ran after Arturo.

Arturo heard more gunshots and fell to the ground. He got up, ran some more, and then fell again. Carrillo ran up to him, stood over him and pointed the gun at him. Arturo closed his eyes and heard a clicking sound. When he opened his eyes he saw Carrillo running back toward Jasso's truck. The truck backed up the street, then drove off.

Arturo telephoned H.A. and told her Carrillo had shot him. After calling 9-1-1, H.A. found Arturo two doors away, bleeding profusely. The police and an ambulance responded. In the area around Arturo, police officers found nine expended shell casings and two spent bullets. Arturo sustained ten gunshot wounds and almost died. He underwent six surgeries and testified that he possibly needed more. At the time of trial he was still doing physical therapy. He had suffered permanent nerve damage in his legs which prevented him from running. He still walked with a cane.

Two neighbors had witnessed the shooting. One of them, Ryan B., heard the gunshots and went outside. He saw a silver Toyota pickup truck backing up in the middle of the street, and he remembered part of the license plate number as 7YR4. Ryan testified the truck's driver looked directly at him and put a finger to his lips in a "Be quiet" sign. Ryan identified Jasso as the driver. According to California Department of Motor Vehicle records, the license plate for Jasso's Toyota truck was 7Y43053.

2. *Defense evidence.*

Detective Lisa Governo interviewed Arturo at the hospital and she testified that, according to the written report of the interview, Arturo said that after confronting Carrillo at the pay phone he made a cell phone call to a friend. After hanging up with his friend, Arturo called H.A. to see if she was ready to go. Governo testified she had no independent recollection of these statements.

3. *Proceedings.*

Carrillo and Jasso were tried jointly. Jasso was convicted of premeditated attempted murder for having aided and abetted the shooting of Arturo. Jasso appealed separately and we affirmed his conviction in an unpublished opinion filed November 18, 2013 (B242229). The jury also convicted Carrillo of premeditated attempted murder, but acquitted him of having kidnapped H.A., convicting him instead of the lesser included offense of false imprisonment by violence. The jury also acquitted Carrillo of having raped H.A., but convicted him of sexual penetration by a foreign object.

**CONTENTIONS**

1. There was prosecutorial misconduct during closing argument.

2. The trial court erred by instructing the jury with CALJIC No. 2.21.2.

3. [By the Attorney General] The judgment must be modified to include mandatory assessments.

**DISCUSSION**

1. *Prosecutorial misconduct.*

Carrillo contends his conviction must be reversed because the prosecutor committed misconduct during closing argument. There is no merit to this claim.

a. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the

6

defendant's specific constitutional rights – such as a comment upon the defendant's invocation of the right to remain silent – but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citation.]" (*People v. Riggs* (2008) 44 Cal.4th 248, 298.)

" ' "[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom." ' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 752.) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "[C]onduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Espinoza* (1992) 3 Cal.4th 806, 820.)

b. *Discussion*.

(1) *Misstating evidence*.

Carrillo contends the prosecutor committed misconduct by telling the jury he had confessed to raping H.A. during his police interview. The prosecutor said: "You saw the video. You followed along with the transcript, and you know that defendant Carrillo admits to going to his ex-girlfriend's house, to getting in her car and having her drive into [*sic*] his house, to arguing with her there, to him not wanting her to leave, to going inside of the apartment, to putting part of his penis into her vagina, and admitting to putting his finger into her vagina and also into her anus." Defense counsel objected that this "misstates the evidence as far as the defense statement regarding putting his penis in [H.]."

7

After the trial court reminded the jury it had to decide the case based on the evidence presented at trial, the prosecutor continued: "If I remember that a little bit differently, you have the DVD [of the police interview]. You'll have the transcript, and you also have [H.]'s testimony. [¶] Again, I'm not saying that they match perfectly."

Prosecutorial misconduct may take the form of "mischaracterizing or misstating the evidence." (*People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1268; accord *People v. Davis* (2005) 36 Cal.4th 510, 550.) Carrillo is correct that the prosecutor misstated exactly which sexual acts Carrillo admitted during his police interview. The interview can reasonably be read as Carrillo's admission that he forced H.A. to ride with him to his apartment, forced her into the bedroom, and there, against her will, put his finger into her vagina and her anus. However, Carrillo did not admit having raped H.A. The detectives never asked him about that aspect of the assault and Carrillo did not volunteer the information. But the prosecutor's misstatement was minor and it was cured by his subsequent statement that he might be misremembering the evidence. (See *People v. Seaton* (2001) 26 Cal.4th 598, 662 ["minor and inadvertent misstatement of the evidence, which the prosecutor qualified with the words 'as I recall,' could not have affected the outcome of the trial"].) In any event, the jury acquitted Carrillo on the forcible rape count.

### (2) *Misstating the law.*

Carrillo contends the prosecutor committed misconduct by misstating the law regarding the jury's role in determining witness credibility. The prosecutor said:

"And [H.] took us back several weeks and months and shared with us the fact that [Carrillo] would not take no [for an answer].

"And so in the context of. . . her dealing with him often, in the context of her wanting him to just go away, that's . . . why she reacted the way that she did. And in her mind, it was the best way of doing it. In [Arturo's] mind, it was the best way of doing it.

"[Arturo] had done it before. Art[uro] had been willing to drive over to Mario Carrillo's house and shake his hand and hoping [*sic*] that things were going to be okay.

8

"Now, some of you may say that's reasonable.  Some of you may say that's unreasonable, but that's what he did.  And it's uncontroverted.  And that's perfectly fine.  So that's not the reasonableness.

"The reasonableness is does . . . all of the evidence put together, does that leave you not only with a doubt, because you may have some questions that you'd like answered, but is it a reasonable doubt that goes really to the heart of the matter."

At this point, defense counsel asked for a sidebar, objected and the following colloquy occurred:

"[Defense counsel]:  [W]hat he's doing is he's arguing something that's contrary to the law and that is he's trying to tell the jury that reasonableness is not an issue when it comes to evaluating the witness' testimony; that somehow there's something they're supposed to separate out from that what he calls the core facts, and that reasonable doubt somehow has to do with the core facts, not their evaluation of the witnesses.  [¶]  And that is entirely wrong.  It's misguiding the jury as to the law.  They can find reasonable doubt on the basis of their not believing the witness.  That's essential in the law.

"[The prosecutor]:  But that's not what I'm saying.

"The Court:  I don't get that either.  Why don't you explain what you're saying.

"[The prosecutor]:  What I'm saying is in a vacuum one can argue that their actions were not reasonable; that the average person wouldn't do something like that; that they have to look at it kind of in the totality of the circumstances that most people have lived.  And in those circumstances, it is reasonable.  [¶]  But at the end of the day, what you need to focus on is the totality of the circumstances and . . . has the case been proven beyond a reasonable doubt.  I think that is on point with the law.

"[Defense counsel]:  I don't agree [*sic*] with counsel that he can argue . . . it's reasonable for these people to act as they did within the context of evidence that's been presented, but he can't say that . . . reasonableness that I was arguing is not an issue to be considered by the jury; that somehow reasonable doubt does not include that.  That's not true.

"The Court: I think maybe the problem that you're having is he's referencing something you said in making his point, right?

"[Defense counsel]: He did, yes.

"The Court: Maybe you can do it independently of that.

"[The prosecutor]: Okay. I'll try.

"The Court: Because I don't see any problems with what I've heard. I mean, he's saying you consider all of the facts and the background circumstances here.

"[Defense counsel]: But they're supposed to bring their common sense and that's what I'm appealing to is their common sense."

It is well-established that "it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]." (*People v. Marshall*, *supra*, 13 Cal.4th at p. 831.) Carrillo argues "the prosecutor committed misconduct by . . . misleading the jury on how they should judge the credibility of the prosecution's witnesses." We disagree. Although the disputed comments were far from clear, they appear to have been merely an innocuous assertion that deciding if a witness' conduct has been reasonable or unreasonable (e.g., was it reasonable for Arturo to approach Carrillo in the hopes of defusing the situation through rational conversation?) is different from deciding if the prosecution proved the defendant guilty beyond a reasonable doubt. As such, there was nothing improper about the prosecutor's comments. (See *People v. Frye*, *supra*, 18 Cal.4th at p. 970 ["we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements"].)

In light of the extremely strong direct evidence of Carrillo's guilt, the defense strategy at trial was to attack the credibility of H.A. and Arturo wherever possible. For instance, defense counsel questioned the believability of H.A.'s testimony that, despite having seen the lights go on in her house at 3:00 a.m. while she was being accosted by Carrillo, she failed to call out for help. Counsel similarly questioned H.A.'s story that she chatted with Carrillo's mother about the duck without ever asking her to intervene

10

and protect H.A. from Carrillo.  As to Arturo, counsel argued it was unbelievable that while waiting for H.A. to get changed he called a friend just to chat, suggesting Arturo must have been seeking armed backup to deal with Carrillo.  Defense counsel argued these stories were so unbelievable the jury would be justified in rejecting the whole of the victims' testimony and returning a verdict in Carrillo's favor.[4]  Carrillo's claim on appeal is that the prosecutor told the jurors they were not allowed to do that.  But, as we have pointed out, this is far from the most reasonable interpretation of the prosecutor's comments.  Moreover, that interpretation would have directly contradicted CALJIC No. 2.21.2, which told the jury:  "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others.  *You may reject the whole testimony of a witness who willfully has testified falsely as to a material point*, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."  (Italics added.)

In sum, we find the prosecutor did not mislead the jury about its proper role in evaluating witness credibility.

(3) *Referring to evidence outside the record.*

Carrillo contends the prosecutor committed misconduct by telling the jury additional officers who responded to the shooting scene could have been called to testify, but their testimony would have been redundant.  We conclude that, although improper, the referenced extra-judicial evidence was so trivial "it is [not] reasonably probable that

[4]    The prosecutor, however, quite effectively countered this strategy by arguing the defense was contesting merely unimportant details.  Thus, the prosecutor told the jury: "Now, are there some minor inconsistencies, some things that you would think, 'Well, why didn't someone call?  Why didn't it happen this way?'  Who cares?  The bottom line is he was there, he did take her to her house, he forced her inside the house, he forced himself on her, and he admits that."  Again: "[W]hat's pointed to are some minor inconsistencies regarding testimony in what was said almost three years ago.  Is that so unreasonable?  It's not."  "Now, I guess the argument was made that [Arturo] must have been on a call to another friend to get some backup.  Let's even give them that much.  That's wild speculation.  The kind of wild speculation that you shouldn't be considering, but let's give them that much.  [¶]  Okay.  So he's calling a friend.  Come help me out.  So how does that affect our case?  It doesn't.  Doesn't change this case whatsoever."

11

without such misconduct, an outcome more favorable to the defendant would have resulted." (*People v. Riggs*, *supra*, 44 Cal.4th at p. 298.)

The prosecutor told the jury: "[T]he evidence was such that we know that there were more people out there. There were more officers. [¶] I suppose everyone could have testified. We could have had a lot more people come and testify, but once you have solid evidence that substantiates what's been said, from my perspective I stop at that point. There's no point in doing more. [¶] Did you really want to hear from 17 different officers?"

At sidebar, defense counsel objected that the prosecutor was improperly referring to facts outside the evidence, telling the jury in effect: "I had more evidence that went to the same point, but it would have been cumulative and I didn't want to bore you." The prosecutor conceded it is improper to refer to what uncalled witnesses would have testified to, but argued he was merely commenting on the evidence in the record showing there had been more officers present at the shooting scene than the two who testified. Although defense counsel rightly responded by noting the prosecutor's comments *implied* these other officers would have corroborated the testifying officers, the trial court overruled the objection.

When closing argument resumed, the prosecutor told the jury:

"Okay. Point of clarification, again, I'm going to remind you, the People have the absolute burden of proving the case. The People have the absolute burden of providing witnesses and calling witnesses to establish their case, to establish their case beyond a reasonable doubt.

"You're going to be given an instruction that not all witnesses are necessarily called. Not every potential witness has to be called. Again, so long as at the end of the day the evidence that you're provided satisfies you beyond a reasonable doubt that the crimes were committed, then that's all you need.

"To the extent that you know there were other officers [who] responded to the location, even though some of the people who testified had partners, I don't mean to imply that they would say one thing or another, that they would bolster, or I'm not

12

implying anything about their testimony. But rather my point to you is that the evidence that has already been presented to you through the people who testified establishes beyond a reasonable doubt [*sic*]."

Defense counsel objected again.

On appeal, Carrillo argues these remarks constituted improper vouching: "The prosecutor's argument about having '17 other witnesses' who would have corroborated the prosecution's case clearly amounted to the prosecutor improperly 'vouching' for the credibility of the People's case." While technically true (see *People v. Bolton* (1979) 23 Cal.3d 208, 212-213 [prosecutor's implication there was additional evidence "tended to make the prosecutor his own witness – offering unsworn testimony not subject to cross-examination"]), given the prosecutor's subsequent remarks acknowledging the People's "absolute burden of providing witnesses" and the triviality of the evidence impliedly referred to, there could have been no resulting prejudice.

(4) *Appeal to passion and prejudice.*

Carrillo contends the prosecutor committed misconduct by appealing to the jury's passions and prejudices when he described Arturo's injuries: "Now, [Arturo] he gets shot multiple times. Police arrive; the ambulance arrives; he's in and out of consciousness; ultimately, taken to the hospital; at the hospital for two or three weeks; five surgeries. You saw the young man. He walked here in front of you with a cane. [¶] His body shattered, his dreams shattered. His goal of becoming a deputy sheriff out the window because now he can't curl his toes so he can't run."

When defense counsel objected, the trial court reminded the jury it had to decide the case based on the evidence presented. Resuming argument, the prosecutor said: "And I remind you, all of that is part of the evidence that's before you. [Arturo] shared that with you; that he can't bend his . . . toes so therefore he can't run very well. He still has bullets in him, so there's still surgeries to come for that. That's great bodily injury."

"It is 'settled that an appeal to the jury to view the crime through the eyes of the victim is misconduct at the guilt phase of trial; an appeal for sympathy for the victim is out of place during an objective determination of guilt. [Citations.]' [Citation.]" (*People*

13

*v. Arias* (1996) 13 Cal.4th 92, 160.) However, there is no prejudice where the comments are, like those here, brief and isolated. (See *id*. at p. 161 [no prejudice where "[r]eferences to the murder victim's 'rights' were relatively brief" and "momentary appeal to victim sympathy could have [had] little effect"]; *People v. Medina* (1995) 11 Cal.4th 694, 759-760 [although prosecutor asked jury to " 'do the right thing, to do justice' " for the victim, there was "no reasonable probability [these] brief and isolated comments could have influenced the jury's guilt determination"].)

We conclude there was no reasonable likelihood the jurors would have interpreted these remarks as inviting them to ignore the evidence and find Carrillo guilty on the basis of sympathy for Arturo.

### (5) *Denigrating defense counsel.*

The prosecutor told the jury: "It was also discussed that it's not beyond all possible doubt, . . . but rather reasonable doubt. [¶] And along with that questioning, one of the things that I highlighted for you was that when you walk in the door you can't leave your common sense at the door. I think counsel did a good job in trying to confuse the issue in terms of what's reasonable and what's not, throwing that word out." When defense counsel objected, the trial court just reminded the jury to decide the case strictly based on the evidence presented and the jury instructions.

Carrillo contends the prosecutor's comments amounted to an improper attack on defense counsel's integrity and "carried the erroneous implication that defense counsel was 'manipulating' the evidence that was presented at trial." We disagree.

Personal attacks on the integrity of opposing counsel constitute misconduct. (*People v. Bell* (1989) 49 Cal.3d 502, 538.) However, "[a]n argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what prosecution believes is the relevant evidence is not improper." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47; see *People v. Medina*, *supra*, 11 Cal.4th at p. 759 ["Finally, defendant contends the prosecutor demeaned defense counsel's integrity by observing that 'any experienced defense attorney can twist a little, poke a little, try to draw some speculation, try to get you to buy something . . . .' In our

14

view, the prosecutor's foregoing argument was unobjectionable. To observe that an experienced defense counsel will attempt to 'twist' and 'poke' at the prosecution's case does not amount to a personal attack on counsel's integrity."]

The prosecutor did not improperly denigrate defense counsel.

(6) *Cumulative impact of prosecutor's disputed statements during closing argument.*

Finally, Carrillo contends his convictions must be reversed due to the cumulative impact of the various alleged acts of prosecutorial misconduct. He asserts, "It is inconceivable that the improper comments by the prosecutor were harmless." We cannot agree.

As discussed, most of Carrillo's claims of prosecutorial misconduct are simply without merit. Those that might technically be considered misconduct were very minor. Given the exceptionally strong evidence of Carrillo's guilt, there is no reasonable probability these comments could have influenced the jury's verdict. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 66, disapproved on other grounds in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22 ["any [prosecutorial] misconduct that did occur could not have contributed to the verdict and was thus rendered harmless"]; *People v. Fields* (1983) 35 Cal.3d 329, 363 [improper appeal to jury's sympathy and passion harmless where evidence of guilt was overwhelming].)

2. *Trial court did not err by giving CALJIC No. 2.21.2.*

Carrillo contends the trial court erred by instructing the jury with CALJIC No. 2.21.2 because it lowered the prosecution's burden of proof. As Carrillo concedes, however, our Supreme Court has already rejected this claim.

CALJIC No. 2.21.2 provides: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars."

15

Our Supreme Court has repeatedly rejected the claim that the "probability of truth" language in this instruction "impermissibly lightened the prosecution's burden of proof, because it allowed the jury to assess prosecution witnesses by seeking only a probability of truth in their testimony . . . ." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1139, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151; see also *People v. Nakahara* (2003) 30 Cal.4th 705, 714 ["Defendant contends [CALJIC No. 2.21.2] 'allowed the jury to assess prosecution witnesses by seeking only a probability of truth in their testimony.' But as we have held, the targeted instruction says no such thing."].)

There is no merit to this claim.

3. *Modify judgment to add mandatory assessments.*

Under section 1465.8, a $40 court operations assessment must be imposed for each criminal conviction. (*People v. Roa* (2009) 171 Cal.App.4th 1175, 1181.) Under Government Code section 70373, subdivision (a), a $30 court facilities assessment must be imposed for each criminal conviction. (*People v. Lopez* (2010) 188 Cal.App.4th 474, 480.) Here, the trial court imposed only a single $40 court operations assessment fee.[5] The judgment will be modified to properly reflect the imposition of these assessments for each offense Carrillo was convicted of committing.

---

[5]    Although a clerk's minute order and the abstract of judgment reflect the imposition of both assessments on each conviction, these documents do not control over the trial court's contradictory oral pronouncement of judgment. (See *People v. Mesa* (1975) 14 Cal.3d 466, 471 ["[A] discrepancy between the judgment as orally pronounced and as entered in the minutes is presumably the result of clerical error. Nor is the abstract of judgment controlling. 'The abstract of judgment is not the judgment of conviction. By its very nature, definition and terms [citation] it cannot add to or modify the judgment which it purports to digest or summarize.' "]; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385 ["Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls."].)

16

## DISPOSITION

The judgment is modified to reflect the imposition of a $40 court operations assessment (§ 1465.8) and a $30 court facilities assessment (Gov. Code, § 70373) as to each conviction.  As modified, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



KITCHING, J.



ALDRICH, J.